# GILBERT BRUDVIK and H. H. Steele, Copartners, Respondents, v. FROSAKER BLAISDELL COMPANY, a Corporation, Appellant.

(216 N. W. 891.)

**Joint adventures — partnership — defendant had knowledge of arrangement between dealer and third party.**

1. An automobile dealer entered into a contract with two parties whereby such parties agreed to pay for cars supplied to such dealer by a distributor, the cars to be resold by the dealer and the commission divided. In an action brought by the parties so furnishing the money against the distributor for the proceeds of resale contracts made by the dealer, the evidence is examined and it is held:

(a) It is sufficient to establish that the plaintiffs were jointly interested in the adventure of financing the purchase of automobiles by the dealer.

(b) It is sufficient to establish that the distributor had knowledge of the arrangement existing between the dealer and such third parties.

**Joint adventures — certain agreement is joint adventure — not partnership.**

2. An arrangement whereby two parties are to furnish money for the purchase of automobiles to be resold by another party, the profits or commissions to be shared by all and the contracts of sale to stand as security for the money advanced, is a joint adventure and not a general partnership.

**Joint adventures — may show actual interest of each in property bought.**

3. Where in carrying out a joint adventure property is purchased with the money of one or more of the interested parties, such property does not become that of all of the joint adventurers and the parties to such relation may show the actual interest of each in the property so acquired.

**Parties — when joint adventurers are "real parties in interest."**

4. Where the proceeds of property belonging to certain of the joint adventurers are converted or withheld by a third party, such owners are the real parties in interest in an action brought for the recovery of such proceeds.

**Joint adventurers — may recover from person knowing situation withholding property for personal indebtedness.**

5. Where joint adventurers carry on a joint enterprise in the name of one of their number, P., through whose negotiations moneys are received, which, to the knowledge of the recipient, belong to the other joint adventurers, such parties

---

Note.— (2) As to what amounts to joint adventure generally, see annotation in 48 A.L.R. 1055; 15 R. C. L. 500; 3 R. C. L. Supp. 461; 4 R. C. L. Supp. 998; 5 R. C. L. Supp. 841; 6 R. C. L. Supp. 920; 7 R. C. L. Supp. 508.

may recover from the recipient any amount withheld to apply on the personal indebtedness of P., but may not recover the amount of a remittance to P., although the latter may have converted it to his own use.

Opinion filed December 12, 1927.

Joint Adventures, 33 C. J. § 16 p. 846 n. 71; § 48 p. 856 n. 61; § 96 p. 871 n. 21. Partnership, 30 Cyc. p. 591 n. 21.  Trover and Conversion, 38 Cyc. p. 2050 n. 81.

Appeal from the District Court of Ward County, *Moellring,* J. Modified and affirmed.
*McGee & Goss, L. E. Blaisdell,* and *J. C. Miller,* for appellant.
*B. H. Bradford,* for respondents.

BIRDZELL, Ch. J.   This is an action by the plaintiffs, as copartners, to recover of the defendant the sum of $1,764, which the plaintiffs allege, was received by the defendant from the General Motors Acceptance Corporation for the use of the plaintiffs.  From a judgment in favor of the plaintiffs entered on a verdict of a jury, the defendant has appealed.   The facts necessary to an understanding of the questions presented on appeal may be briefly stated as follows:  The defendant company, of Minot, being in the business of dealer and distributor of certain automobiles, entered into a contract with one John Peterson, under which the latter became an associate dealer in automobiles at Mohall.   In March, 1926, Peterson was owing to the defendant a sum of money on an open account and another sum secured by a mortgage. Owing to lack of resources and credit, it was difficult for him to obtain from the defendant cars for sale for which he would be required to pay the net price.   He therefore made arrangements with the plaintiffs, who were in the banking business at Mohall, whereby the plaintiffs would finance the purchase of cars by Peterson from the defendant, honoring drafts accompanying bills of lading drawn by the latter upon Peterson, the plaintiffs to be repaid out of the proceeds of the sale of the cars.   As compensation for thus financing the purchase, the plaintiffs were to receive a portion of the commission that would otherwise belong to Peterson.   With this arrangement in mind the plaintiffs and Peterson went to Minot about March 30, 1926, and went to the place of business of the defendant company where there was some talk re-

garding the arrangement. The substance of the talk is involved in dispute, but soon thereafter some cars and trucks were shipped to Peterson. A bill of lading accompanied by a sight draft was forwarded to the Renville County Bank, an institution operated by the plaintiffs, where the draft and freight were paid and the cars and trucks were afterward delivered. They were subsequently sold. Peterson then forwarded the sales contracts to the General Motors Acceptance Corporation, which declined to advance money on them and returned them to him. He afterwards solicited the assistance of the defendant company in obtaining the cash on these contracts and after new contracts had been executed by the purchasers and indorsed by the defendant a draft was received by the defendant for the proceeds, $1,764. The defendant cashed the draft and retained the proceeds, crediting Peterson with the amount owing on his open account, returning to him his note and mortgage representing other indebtedness together with its check for the balance. After some subsequent negotiations in which Peterson tendered back the note, mortgage and check, this action was brought.

The first contention on the appeal is that there is a failure of proof as to the existence of a partnership between the plaintiffs and, therefore, no proof that the defendant received moneys belonging to the plaintiffs. There is ample evidence in the record that Brudvik and Steele were jointly interested in the venture of financing the purchase of the automobiles by Peterson to be resold by the latter, and in a division of the commission to be thus earned. But it is argued that, if any partnership existed between these plaintiffs, it is a partnership of which Peterson was also a member and that the plaintiffs in no event could recover without joining Peterson.

The agency contract was in Peterson's name. The cars were shipped by the defendant to Peterson. The bill of lading was sent to the bank designated by Peterson in his contract (it is the bank operated by the plaintiffs). If the plaintiffs have a right to recover the proceeds of the resale of the cars in this instance, it is because of their arrangement with Peterson known to the defendant. The principal controversy in this case centers about the arrangement between Peterson and the plaintiffs and the defendant's knowledge of that arrangement. Brudvik testified that Peterson wanted to be financed and that he and Steele were buying the cars which Peterson was to resell for them. Peterson

testified that the plaintiffs were paying for the cars and that he was reselling them on a commission basis. There can be no doubt, in our opinion, that there is ample evidence of an arrangement existing between Steele and Brudvik on the one hand and Peterson on the other, to the effect that the former were to furnish the money for the purchase of cars, which were to be resold by the latter, and that the contracts of sale were to stand as security for the money advanced; also, that it was contemplated that these should be turned over to the General Motors Acceptance Corporation where cash would be realized upon them.

The evidence as to the knowledge of the defendant of this arrangement is substantially as follows: Blaisdell, one of the officers of the defendant company, testified that he remembered the sale of a carload of automobiles to Peterson, the agent at Mohall; that he did not know Steele; that possibly Brudvik was there when this sale was made; that he was not informed that Steele and Brudvik would pay for the cars. Later, however, he testified that on one occasion he saw Brudvik and Steele at the place of business of the defendant in Minot; that Peterson said he had got squared away to handle cars and wanted to get a carload; that he would pay for them; that the witness told Peterson that if we (meaning the defendant) had to finance them we wouldn't give them as good a commission as if they paid cash and that Peterson said "All right;" that he and Brudvik walked out to the door a little ways from the office so they were not in his hearing and he came back and said "We will pay cash from now on and I says 'Fine;' " that he heard nothing as to where the cash was coming from, that nothing was said to him; that Brudvik didn't talk to him although he was present part of the time; that it was his understanding that the defendant was selling cars to Peterson, the only man it was authorized to sell them to by the terms of their contract with the company, and that he had no business deals with and made no sale of cars to Steele or Brudvik; that Brudvik never told him at any time to ship cars to Peterson and that he, or he and Steele, would pay for them.

Referring to a later date, after Peterson had failed to get the money from the General Motors Acceptance Corporation, Blaisdell testified that Peterson brought the papers to him and said that the General Motors Acceptance Corporation would not discount them and asked if there was anything he could do in the matter. He told Peterson that

if he would leave the papers the General Motors would accept any papers submitted by the defendant because its credit was good; that shortly thereafter he made up a new set of papers over the signature of the defendant and took them to Peterson who assisted in getting the signatures of the purchasers thereon. He testified to what happened at the time the draft came from the General Motors Acceptance Corporation as follows: "Q. Did you not then state to Mr. Brudvik and Mr. Peterson, in the presence of Mr. Strommen, that when this money came it was your intention to send the money on immediately to Mohall? A. I did not. Q. Did you not say further that it would have been done had not Mr. Frosaker got hold of the check? A. No, sir. Q. Nothing of that character? A. Yes, something of that character. Q. Oh, something of that character. Now then did you not say that Mr. Frosaker said 'This is a good chance for us to clean up with Mr. Peterson and we will clean up with him right now?' A. I don't remember that I said that. I possibly did. I wouldn't say as to that. . . . Q. Go ahead and tell the jury just as near as you can all and what was said there without my asking you. A. Well at the time our bookkeeper was in the hospital with appendicitis and I was looking after the books, Mr. Peterson and Mr. Brudvik and Mr. Strommen came in and Mr. Strommen really took the initiative. He said 'We come down to see if we can't square up that deal and there is no'—I think the words he used was 'there is no use for us to scrap about a thing that we could both of us make more out of it by settling it amicably.' And I quite agreed with that, that I thought it would be much better to settle it amicably than to be, to fight about it, so they said 'Well, can't we get it fixed up?' and I said 'Well, I don't know. I believe that had that draft come to me from the G. M. A. C. that I could have amicably settled it in some way with you.' And 'Well,' he said, 'can't you do something with it now?' and I said 'Well it is, I can't do much with it now because it is pretty much out of my hands for Mr. Frosaker to complete it, and I don't see where there is much chance for me to do anything. . . .''

Brudvik testified that in March, 1926, he and Steele had made arrangements to handle some automobiles; that they went to Minot and had a conversation with Joe Blaisdell, talking about the rate of commissions on driveouts and carload lots; that Peterson was there and

they talked over the purchase by the plaintiffs of automobiles. "Q. Well was there anything said to Mr. Blaisdell by you as to who was buying these cars? A. Well, sir, I believe we went into the proposition and told him that we were going in with Peterson. Q. You were going in with Peterson? A. Well, that Peterson wanted to be financed and that we were buying the cars and that he was to in turn resell them for us. Q. And you were to allow him a commission for selling them? A. Yes, sir. Q. You told that to Mr. Blaisdell? A. I think it was mentioned in his presence, yes, sir."

Peterson testified: "Q. Was the fact that Mr. Steele and Mr. Brudvik were paying for each of these cars discussed at that time with Mr. Frosaker and Mr. Blaisdell? A. It was discussed with Mr. Blaisdell. Q. He was at that time told that Steele and Brudvik were paying for the cars? A. Yes. Q. And that was before the first cars were purchased? A. Yes. . . . Q. And what was that arrangement that you had yourself with Steele and Brudvik? A. They were buying the cars and I was reselling them on a percentage basis."

We are of the opinion that this evidence is sufficient to form a question of fact for the jury as to whether or not the defendant knew of the arrangement whereby Steele and Brudvik were to pay for the cars and thus to become entitled to the security afforded by the resale contracts.

As previously indicated, there is a contention in the brief of the appellant that any partnership arrangement existing between the plaintiffs included Peterson and the testimony referring to the arrangement for splitting the commission or profits upon the resale is relied upon to substantiate it. This contention does not reach the merits of the present controversy. It is claimed by the plaintiffs and conceded by Peterson that the plaintiffs were not interested with Peterson in the automobile business generally; that they were interested only to the extent of the resale of the cars that they should pay for and in a division of the commissions earned. They did not advance a given amount of capital for the purpose of conducting a partnership business. They entered upon a joint adventure with Peterson in the purchase and sale of a carload of automobiles. 15 R. C. L. 500. While the relationship of the parties to a joint adventure, as between themselves, is quite similar to that of partners, nevertheless, owing to the more limited scope of activity, some

incidents of a partnership do not necessarily attach. Actions at law may be maintained by one party to a joint adventure against another for breach of a contract, or for a share of the profits or losses, or to recover a contribution for advances made (see 15 R. C. L. 507)—matters which ordinarily require adjustment as between true partners through a suit in equity. Where the parties to a joint adventure have agreed upon the character of the contribution that each shall make, the law gives effect to their agreement as made, except in so far as they may be estopped as against third parties relying upon an ostensible situation. Thus, where a broker purchases goods for a merchant with the money of the latter under an arrangement whereby he is to receive a certain proportion of the profits arising upon the resale and bear a portion of the losses, if any, the broker does not acquire an interest in the property thus purchased. Smith v. Watson, 2 Barn. & C. 401, 107 Eng. Reprint, 434; and to like effect, Moore v. Huntington, 7 Hun, 425; Ross v. Willett, 76 Hun, 211, 27 N. Y. Supp. 785. In the latter case, referring to the rights of the parties to a joint adventure, the court, at page 786 (76 Hun, 213), said:

"A joint adventure is a limited partnership; not limited in a statutory sense as to liability, but as to its scope and duration; and under our law joint adventures and partnerships are governed by the same rules. Hubbell v. Buhler, 43 Hun, 82–84. It cannot be denied that it is entirely legal and competent for persons to agree that they will share the profits and losses arising from the purchase and sale of goods, though, as between themselves, one of them retains the legal title to the goods. In case A. and B. agree that the former shall purchase certain articles at an agreed price for the purpose of speculation, and that they shall share the profits and losses arising from the venture, they do not, as between themselves, become partners in the goods, but are such in respect to the profits and losses."

The parties to such a relation may show the actual interest of each in property acquired in the prosecution of the joint adventure. Re McConnell (D. C.) 197 Fed. 438. See also 17 Ann. Cas. 1023; Ann. Cas. 1916A, 1211.

In the instant case the testimony shows that the property in which the joint adventurers were interested was purchased with the money of the plaintiffs. Upon the purchase it became their property and not

that of Peterson. He merely had an interest in a division of the profits or commission upon resale. The fact that Peterson's name was used in the bill of lading does not affect the matter. This fact is explained in the record by the evidence showing that the defendant was only authorized to make sales on such a basis to sub-agents and that Peterson had a contract as such agent. As indicated above, there is sufficient evidence to warrant a jury in finding that the defendant had notice of the true relations between the plaintiffs and Peterson and of the fact that the plaintiffs were furnishing the money. Even if a true partnership existed the defendant would have no right to offset against a partnership claim an account which was owing to it by an individual partner. The defendant had been paid in full for the automobiles in question and the fund for which it is sued is derived from a sale by it of papers evidencing the right to receive from the present owners the purchase price. The record, in our opinion, shows that Brudvik and Steele are the real parties in interest in a suit involving the proceeds of the sale of the cars which were purchased with their money and of which they were in fact the owners. Peterson's interest at no time extended beyond the commissions to be earned upon a resale, and upon the trial he disclaimed all interest.

Error is predicated upon the instructions of the court in which, in effect, the court told the jury that the plaintiffs were the owners of the automobiles and of the proceeds of the sales to the various purchasers. We are of the opinion that this charge is correct for the reasons above indicated. The testimony going to establish the relation between Brudvik, Steele and Peterson being practically undisputed, the legal effect of that arrangement is a matter for the court to define, and this it properly did. Of course, the court further charged that, if the defendant had no notice or knowledge of the ownership or interest of the plaintiffs in the proceeds, and if it dealt to its prejudice with Peterson, the plaintiffs would be estopped to assert their interest.

Pursuant to the instructions of the court, the jury returned a verdict for the entire amount of the proceeds of the sales contracts which came into the hands of the defendant. The verdict is necessarily excessive to the extent of $658.74, this being the amount of the check forwarded by the defendant to Peterson in accounting for the remainder of the proceeds, after balancing his open account and returning his note and

mortgage.  After the failure of the negotiations looking toward a settlement of the dispute between the parties to this litigation, Peterson cashed the check.  The plaintiffs, in dealing with the defendant, dealt in Peterson's name; likewise, in dealing with purchasers of the cars they took the contracts in Peterson's name.  They left it to Peterson to procure these contracts to be discounted.  Had the General Motors Acceptance Corporation sent Peterson a check for the entire amount of the contracts, even though with full knowledge that the proceeds were to be turned over to the plaintiffs, it would have been protected had Peterson converted the money to his own use.  Since the plaintiffs elected to transact business with the defendant in the name of Peterson, the defendant was justified in remitting to him the proceeds of the sale in so far as they did remit to Peterson.  Peterson's subsequent action in cashing the check, therefore, must be considered as the action of the plaintiffs' agent.  The mere fact that the defendant sought to convert the entire proceeds does not make it chargeable for the whole amount when, as a matter of fact, it succeeded in converting only the amount applied upon Peterson's indebtedness.

We have discussed all the assignments of error which seem to us to involve the merits of this controversy on appeal; and, finding no error except that resulting in the excessive verdict, the order of this court will be that the judgment be reduced to the extent of the excess and as so reduced affirmed, the appellant to recover costs on the appeal.

NUESSLE, CHRISTIANSON, BURKE, and BURR, JJ., concur.